# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| Cargill, Incorporated<br><br>Plaintiff,<br><br>v.<br><br>David Bingenheimer<br>W 148 N10912 High Ridge Court<br>Germantown, Wisconsin 53022<br><br>Defendant | ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.: 2:17-cv-300<br><br><br>**COMPLAINT** |

Plaintiff, Cargill, Incorporated ("Cargill"), by counsel, for its Complaint against Defendant Bingenheimer ("Bingenheimer" or "Defendant") states as follows:

## INTRODUCTION

1.     This action is brought to remedy Defendant's disloyal and unlawful conduct in taking, retaining and misappropriating Cargill's property, including its confidential, proprietary, and trade secret information following the separation of his employment with Cargill.

2.     Cargill employed Defendant as a Global Technology Manager in its Food Ingredient & Bio-Industrial Enterprise.  Defendant's job was to project, increase and promote the Company's good will with existing and prospective customers and in the marketplace, and to service, solicit and support, the customers and prospective customers assigned to him by Cargill.

3.     Defendant's last active day of employment with Cargill was November 21, 2016. Cargill, however, let Defendant keep possession of his computer for a few days so he could remove personal items from the computer

4.     Cargill had no idea, however, that Defendant used this opportunity to covertly copy to a USB/flash drive Cargill's most sensitive proprietary and highly confidential and trade secret information relating to its dielectric business.  These included: a formula for Cargill's

synthetic dielectric fluid; detailed financial information; marketing plans; strategic growth plans; and detailed information about Cargill's dielectric customers including revenue expectations, pricing, profit margins, and related information. One of these documents identified major customers for Cargill's global dielectric fluid business, including the volumes and margins for each of these customers.

5.     Cargill also recently discovered that Defendant used numerous other flash drives to download Cargill's proprietary, highly confidential, and trade secret information in the months leading up to his departure.

6.     When Defendant returned his Cargill laptop, he failed to return the numerous USB/flash drives containing Cargill's highly confidential and trade secret information.

7.     Further, after his last day of active employment, Defendant used his credentials to access Cargill's salesforce.com account for the dielectric business. This account contains highly confidential customer-related information about Cargill's dielectric business. In fact, Defendant accessed this account more times **<u>after</u>** his last day of active employment than he did in the four years **<u>before</u>** his last day.

8.     As discussed below, Defendant has recently joined one of Cargill's key competitors as its Director of Business Development. Armed with the information he stole from Cargill, Defendant will undoubtedly use this information to illegally compete against Cargill. Indeed, Cargill believes that Defendant has already disclosed the stolen confidential information and trade secrets to his new employer.

9.     Cargill has already lost substantial revenue as a result of Defendant's misconduct and, if temporary and preliminary injunctive relief is not granted, it will certainly lose more.

10.     As such, Cargill brings this action for: (1) misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*; (2) misappropriation under the

Wisconsin Uniform Trade Secret Act, Wis. Stat. § 134.90 *et seq.*; (3) breach of fiduciary duty/duty of loyalty; (4) tortious interference with prospective economic relations; and (5) conversion.

11.     Based on Defendant's misconduct outlined below, Cargill respectfully seeks remedies against Defendant, including injunctive and monetary relief, damages, lost profits, unjust enrichment, and other relief.

## THE PARTIES

12.     Plaintiff Cargill is a corporation that is organized and existing under the laws of the State of Delaware, with its principal place of business in Minneapolis, Minnesota.

13.     Defendant David Bingenheimer is an individual, residing within this judicial district at W 148 N10912 High Ridge Court, Germantown, Wisconsin.

## JURISDICTION

14.     This Court has original jurisdiction of this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the other claims asserted herein under 28 U.S.C. § 1367.

15.     There is complete diversity and the amount in controversy, on information and belief, exceeds the jurisdictional amount.  Thus, this action is also subject to the Court's diversity jurisdiction under 28 U.S.C § 1332.

## ALLEGATIONS APPLICABLE TO ALL CLAIMS

### Cargill's Dielectric Fluid Business

16.     Cargill is a premier global producer and supplier of food, agriculture, financial and industrial products and services.  With over 150,000 employees in 70 countries, Cargill's business lines are broken down into:  Food Ingredient & Bio-Industrial; Animal Nutrition; Protein & Salt; Agricultural Supply Chain; and Energy Transportation & Metals.

17.     Dielectric fluids are used for electrical equipment like electrical transformers. Their main purpose is to convert voltages from low to high at generating stations in order to efficiently transport energy along high voltage power lines (e.g., 500,000 volts) and then transform the voltage back down to be used in homes and businesses. Dielectric fluids are used as electrical insulators in high voltage applications, e.g. transformers, capacitors, high-voltage cables, and switchgear (namely high voltage switchgear).

18.     Traditionally, dielectric fluids were based on mineral oils produced from traditional petroleum-based sources. Cargill, however, is a leading manufacturer and seller of natural ester or vegetable-based dielectric fluid.

19.     The current dielectric fluid market is heavily dominated by mineral-oil products. Cargill has invested significant time and money developing its vegetable and synthetic-based dielectric fluid business. While at Cargill, Bingenheimer was a key player in developing that strategy. Many of the documents he stole from Cargill memorialize this strategy and business planning. Bingenheimer took these documents and files clearly intending to use them to replicate Cargill's business strategy at his new employer and to compete illegally against Cargill.

20.     One of Cargill's key products in this area is Envirotemp FR3™ Dielectric Fluid, which is a natural ester derived from renewable vegetable oils. It provides improved fire safety and increased transformer life/loadability. It also provides environmental benefits that are superior to mineral oil and any other dielectric coolant: because it is derived from renewable raw materials, it has a very low carbon footprint, unequalled by any other dielectric fluid option.

21.     Envirotemp FR3™ fluid has been used in more than 1 million distribution and power transformers worldwide. Some of the largest utilities and transformer manufacturers use Envirotemp FR3™ for their power and distribution transformers.

4

22.     The dielectric fluids market is extremely competitive, particularly as to pricing, production, delivery, customer lists, and other trade secrets.

<u>**Defendant's Background in the Dielectric Fluid Business and
Employment at Cargill**</u>

23.     Defendant worked in Cargill's Industrial Specialties ("CIS") business as a Global Technology Manager.  CIS is part of Cargill's Food Ingredient & Bio-Industrial Enterprise.

24.     In this position, Defendant was heavily involved in the technology, marketing and sales of dielectric fluids.

25.     Defendant reported to David Roesser ("Roesser") throughout his tenure at Cargill.

26.     Before he started with Cargill, Defendant worked for Cooper Power Systems ("Cooper").

27.     Cooper originally developed the know-how and other trade secrets relating to vegetable-based dielectric fluids, including Envirotemp FR3™ in electrical transformers.

28.     In addition to making dielectric fluids, Cooper also manufactured transformers. Thus, Cooper was able to develop unique test data and product data due to its knowledge of transformers and ready access to its own transformers for testing and dielectric fluid product development.

29.     While at Cooper, Defendant worked as the Global Product Line Manager for Envirotemp FR3™ Dielectric Fluids. In this position, he was privy to unique testing and product data.

30.     Cargill bought Cooper's dielectric fluid business in 2012, and took a license to all of Cooper's trade secrets and proprietary/confidential information relating to natural ester dielectric fluids including, Envirotemp FR3™.  This included all of Cooper's testing data and product specification data for Envirotemp FR3™.

5

31.     Defendant started employment with Cargill as a Product Manager on July 2, 2012. Subsequently, he was named as a Global Technology Manager for the dielectric fluid business.

32.     In these positions, Defendant was responsible for managing the global technology team, dealing with operational issues that came up regarding the product line, and being Cargill's technical face to the market through seminars and papers at industry conferences and events.

33.     Based on his experience with Cooper and then Cargill, Defendant has worked with natural ester dielectric fluids such as Envirotemp FR3™ for several years. Based on what he learned at Cooper and Cargill during these nine years, Defendant was one of very few Cargill employees who had comprehensive knowledge about natural ester dielectric fluids such as Envirotemp FR3™ and the dielectric fluids market.

34.     Based on this extensive experience, Defendant developed a rare set of technical, sales, and product development skills and knowledge.  Defendant not only understands the technical composition and specifications for Cargill's dielectric products, but he also has a deep understanding of exactly how to approach customers and target their needs in order to convince them to adopt a vegetable or synthetic fluid instead of a traditional mineral oil-based fluid.

35.     During Defendant's tenure at Cargill, Cargill also continued market and sales development of a synthetic dielectric fluid, Envirotemp 200™.

**Defendant's Access to Cargill's Confidential Information and Cargill's Extensive Efforts to Protect this Information**

36.     Cargill has an extensive Code of Conduct.  Under this Code, which applies to all Cargill personnel, employees are not permitted to disclose confidential information outside of the company.

37.     Throughout his employment with Cargill, Defendant had access to Cargill's most sensitive and confidential information about Envirotemp FR3™, including all testing data and

6

technology strategies, global commercial strategies, competitive information and strategies, customer tactics, sales pricing and volumes.

38.     Also, throughout his employment with Cargill, Defendant was given full access to the Cargill Industrial Specialties Dielectric Fluids salesforce.com account. This contained highly confidential and critical information and trade secrets about Cargill's customer base, sales efforts, and other detailed marketing information.

39.     In support of its dielectric fluids business, Cargill has invested a significant amount of money and resources into developing and testing Envirotemp FR3™ and Envirotemp 200™ in a significant number of laboratory and in-field transformer tests throughout the course of over several years to prove the fluids ability to work in the application.

40.     In addition, Cargill has also invested significant resources into developing formulas, business plans, customer lists, vendor lists, pricing and sales data, financial information, operating procedures, trade secrets, and confidential information to give it a competitive advantage in winning business from customers; developing new markets; and performing in a manner that leads to repeat business.

41.     As part of his position, Defendant had full access to Cargill's most sensitive and highly confidential information and trade secrets relating to its dielectric fluid business.

42.     Due to the competitive nature of the dielectric fluid business and the considerable effort and expense devoted by Cargill to developing trade secrets and confidential information within its dielectric fluid business, Cargill takes appropriate steps to protect its trade secrets and confidential information from unauthorized disclosure by restricting access to employees who have a legitimate need for the information.

43.     In addition to its Code of Conduct, Cargill also has in place clear safeguards and policies regarding protecting its trade secrets and confidential information and limiting access to

7

its computers and property for authorized purposes only. Specifically, Cargill has password-protection procedures and administrative controls in place to safeguard its trade secrets and confidential information and only preapproved personnel have access to such information. Cargill also has several other policies to safeguard its confidential information, including policies for: Acceptable Use of Technology Assets; Remote Access Use; Mobile Device Storage; and Mobile Device Use. All of these policies were designed, in whole or in part, to protect Cargill's confidential information and all of these policies applied to Defendant during his employment with the company.

44. Cargill also has a Salaried Employment Handbook that applies to employees such as Defendant. This handbook contains detailed provisions prohibiting theft and misappropriation. This handbook also incorporates all of the company's Global IT policies, which are designed at least in part to protect Cargill's confidential information. This handbook applied to Defendant during his employment at Cargill.

45. In August 2016, Defendant received and acknowledged that he received training on Cargill's Code of Conduct, which includes the protection of Cargill's proprietary and confidential information.

46. During his employment at Cargill, Defendant was deeply involved in all aspects of developing strategy and implementing business plans for Cargill's global dielectric fluid business.

47. In this role, Defendant was one of just a handful of people that had access to Cargill's most sensitive and valuable business information like product formulas, profit margins, and customer revenues.

**Defendant's Separation from Cargill and his Covert Taking of Cargill's Trade Secrets and Highly Confidential and Proprietary Information**

48. In 2016, Cargill restructured the management of its dielectric fluid business.

8

49.     As part of this restructuring, on November 21, 2016, Cargill notified Defendant that he was being laid-off with two other employees.

50.     When Cargill told Defendant he was being laid-off, Cargill also told Defendant that he would be offered a separation agreement.  Cargill gave him a copy during the termination meeting.

51.     Defendant then told Cargill that he had just learned of a family health issue. Cargill then agreed to give Defendant enough money to cover his payments for his family's health insurance for calendar year 2017.  Cargill then took back the first separation agreement and replaced it later with one that provided the additional compensation.

52.     Instead of seizing Defendant's company laptop right away at this meeting, Cargill let Defendant keep it so he could remove personal items from the computer.  Cargill asked Defendant to send the laptop back by Wednesday, November 23, 2017.  Defendant, however, did not return the laptop until Tuesday, November 29, 2017.

53.     Cargill had no idea, however, that Defendant used this opportunity to covertly copy (to a USB/flash drive) Cargill's most sensitive and highly confidential and trade secret information relating to its dielectric business.  These included: product formula for Cargill's synthetic dielectric fluid, detailed financial information, sales and marketing plans, strategic growth plans,  strategic plans, pricing information, profit information, budget information, and detailed information about Cargill's dielectric customers including revenue expectations, pricing, profit margins and related information.

54.     Under the Separation Agreement, Defendant's last official day with Cargill was set for January 1, 2017.  Despite not performing any services for Cargill from November 21, 2017 to January 1, 2017, he received regular salary payments through this period. He also received a $22,769.23 (less applicable withholdings and deductions) severance award that was

9

paid to him after his termination date. He continued to receive health benefits throughout the entire month of January 2017 plus he received a separate payment to cover the payment of $10,000 for him to use to continue his health benefits under COBRA for the rest of 2017. Also, his ESOP Annual Allocation became fully vested as of January 1, 2017.

55.     Defendant signed the separation agreement on November 29, 2016. In doing so, he released all potential legal claims against Cargill; agreed to return all Cargill information in his possession or control; and reaffirmed his promises and obligations in the Employee Confidential Information, Inventions and Original Works that he entered into when he joined Cargill in 2012.

56.     The Separation Agreement contained a specific section dealing with return of company property:

> Section 7.     COMPANY PROPERTY
>
> Employee agrees that by Employee's last day of active service, Employee will return to Employer all files, memoranda, documents, records, copies of the following, credit cards, keys and any other property of Employer in Employee's possession. Any proprietary and confidential information and trade secrets that Employee received during Employee's employment that is not in the public domain shall be kept completely confidential and will not be shared by Employee with anyone. Employee agrees that Employee will abide by the terms of the Employee Confidential Information, Inventions, and Original Works of Authorship Agreement entered into by Employee.

57.     On November 29, Defendant returned his company laptop to Roesser. He did not return any USB/flash drives.

58.     At the time, Cargill had no idea that, in the days before he returned his company laptop, Defendant copied numerous highly confidential and trade secret documents to an unauthorized, non-Cargill USB/flash drive. Cargill also had no idea that he retained other

USB/flash drives that he had previously used during the course of his employment to download copious amounts of Cargill's confidential information and trade secrets.

59.     In fact, Defendant never told Cargill that he had these USB/flash drives, or that he used them to download and copy Cargill most sensitive confidential information and trade secrets regarding its dielectric fluid business

60.     Defendant did not return these flash drives to Cargill.

**Cargill Receives Information Suggesting that Defendant is Working in Concert with One of its Top Competitors, M&I Materials, Ltd**

61.     After November 21, 2016, Cargill continued to monitor Defendant's company email account to make sure they did not miss any client inquiries or sales opportunities.

62.     On or about December 12, 2016, Cargill saw an email sent to Defendant's company account from Delta Airlines.  Apparently, after he left Cargill, Defendant failed to change his email address for his Delta account.

63.     This email itinerary showed that Defendant was travelling to Orlando, FL on December 13, 2016.  In Orlando, at that time, there was an industry conference where one of Cargill's chief competitors, M&I Materials, Ltd. ("M&I"), had a booth.  But this alone did not raise any concerns at the time.

64.     On or about January 30, 2017, Cargill saw another email travel itinerary for Defendant from Delta Airlines.

65.     This email itinerary showed that, on February 6, 2017, Defendant was scheduled to travel to Atlanta, GA and stay there for five days.

66.     M&I has a corporate office located in Gwinnett County, GA, just outside of Atlanta.

11

67. Then Cargill received another email itinerary. This one showed that on February 12th, 2017, Defendant was then scheduled to travel from Milwaukee, Wisconsin to Manchester, United Kingdom.

68. M&I has their main corporate headquarters in Manchester, UK.

69. Taken together, these trips raised significant concern at Cargill.

70. M&I is one of Cargill's primary competitors in the dielectric fluid market.

71. M&I touts itself as international company with offices in the UK, USA, India, China and UAE and customers located in 60+ countries around the globe.

72. M&I manufactures and sells an ester-based dielectric fluid that competes directly against, FR3™. M&I also makes and sells a synthetic dielectric fluid that competes directly with Envirotemp 200™.

73. Further, on or about January 23, 2017, M&I visited one of Cargill's key dielectric fluid customers and significantly underbid Cargill's price. To keep this client, Cargill had to renegotiate a new deal with the customer, resulting in a loss of substantial revenue.

74. Before defendant left Cargill, M&I tried unsuccessfully several times to get business from this customer. It was only after Defendant left Cargill and stole its highly confidential information that suddenly M&I was able to target this customer with a competitive price.

**Cargill's Investigates Defendant's USB/Flash Drive Usage and Finds That, after Cargill Notified Defendant of his Lay-Off, he Secretly Downloaded and Copied Numerous Files Containing Cargill's Trade Secrets and Highly Confidential and Proprietary Information Before Returning his Cargill Laptop.**

75. The combination of the Defendant's trips to Orlando, Atlanta, and Manchester, and M&I's aggressive attempt to undercut Cargill's prices at a top customer raised significant concern at Cargill.

76.     As such, Cargill initiated an internal investigation into Defendant's computer access patterns and related activity.

77.     Cargill's internal computer forensic team conducted this investigation.

78.     Cargill found that between November 21, 2016 and November 28, 2016 -- Defendant used an unauthorized flash drive to access and download (i.e., write to USB/flash drive) highly sensitive, proprietary, and confidential information and/or trade secrets about Cargill's dielectric fluid business including, but not limited to:

- An entire copy of a customer file for one of Cargill's biggest customers;

- A spreadsheet listing all of Cargill's top customers, identifying volume by customer, products sold to customer, revenues by customer, pricing by customer, profit margin by customer, and budget expectations for each customer;

- Detailed formula composition for Cargill's synthetic dielectric fluid, Envirotemp 200™;

- Highly detailed description and analysis of the sales game plan and sales development process used by Cargill for customer targeting, customer prioritization, customer revenue goals, analysis of customer needs, methods for identifying customer needs, analysis of customer resources, expected sales outcome, and numerous strategies for identifying key customer and developing greater business with existing customers;

- The entire 2016 EMEA business plan for Cargill's dielectric fluid business;

- Numerous documents analyzing the technical performance of Cargill's dielectric fluid product portfolio;

- FR3 fluid training materials;

- Documents detailing Cargill's sales process for its dielectric fluid business; and

- Documents detailing the sales performance of Envirotemp FR3™ throughout 2016.

79.     One of these documents is a detailed spreadsheet named "Top Customers FY17 vs. Budget vs. FY16 (YTD Oct 16)." This document reveals the game plan for Cargill's dielectric fluid business. It identifies all of Cargill's customers across the world with detailed

information about products purchased, product volumes, and profit margins. In his new position as Director of Business Development for M&I, this is exactly the type of information that Defendant and M&I can use to illegally compete against Cargill and cause great damage to Cargill's dielectric fluid business. It is difficult to imagine a more damaging document that a competitor such as M&I could use against Cargill.

80.     Defendant also took several proprietary and confidential documents regarding legacy information about Cargill's dielectric fluid business, including: (a) detailed budget information for Cargill's dielectric fluid business; (b) detailed sales information for a key Cargill customer for dielectric fluids showing a month by month breakdown of delivery volumes, planned versus actual sales, and a global breakdown of customer needs and volume requirements; and (c) detailed business plan information for Cargill's dielectric fluid business. Although these documents contain older information about Cargill's business, they are still, at minimum, Cargill's proprietary information and Defendant had no right to take them. Further, a competitor would still value this information because it illustrates Cargill's thought processes about its business and, for at least one customer, contains detailed information about the prior product needs and requirements.

81.     Cargill's investigation also revealed that Defendant copied copious amounts of Cargill's proprietary/confidential information and/or trade secrets to other USB/flash drives before November 21, 2016 including:

- Numerous spreadsheets containing competitive pricing analysis for several global regions;

- Training documents for fluid sales;

- Several documents detailing technical speciation for Cargill's dielectric fluids;

- Numerous documents containing product test results;

14

- Several videos of testing for Cargill dielectric fluids;

- Documents detailing practical applications for Cargill's dielectric fluids;

- Documents analyzing Cargill's global sales processes, goals, and expectations; and

- Numerous documents analyzing and detailing the technical performance of Cargill's dielectric fluid product portfolio

82.     These documents are Cargill's proprietary information and contain some of the most sensitive and highly confidential information that Cargill has about its dielectric fluid business.

83.     Defendant was not authorized to remove this critical proprietary and highly confidential information from Cargill.  And he was certainly not authorized to take this information to a competitor, especially M&I.

84.     When Defendant returned his Cargill computer, he failed to return these USB/flash drives.

85.     Moreover, on several occasions after his last day of active employment at Cargill (21 November 2016), Cargill's continued investigation revealed that Defendant accessed his salesforce.com without authorization.  This account contains extensive confidential information about Cargill's dielectric fluid customers and business.

86.     In fact, Defendant accessed Cargill's salesforce.com account more often after his last day of active employment with Cargill than he ever did while we he was working for Cargill.

87.     Defendant was not permitted to access this account after his last day of active employment with the company.

88.     There was no legitimate reason for Defendant to access this account after his last day of active service with the company.

15

89.     The fact that Defendant accessed this account more often after his last day of active employment than he ever did before his last day of active employment indicates that Defendant was accessing this salesforce.com account for an improper purpose.

90.     Cargill's investigation is ongoing.

91.     There is no legitimate business reason for Defendant to have retained Cargill's confidential information and trade secrets.

92.     Recently, Cargill learned that its greatest fears were realized and Defendant is now working directly for M&I.

93.     On February 20-21, Defendant attended an industry conference in San Diego, CA called TechAdvantage.

94.     Defendant attended that conference on M&I's behalf.  In fact, M&I did not arrange to have a booth at this conference until recently.

95.     At this conference, Cargill learned that Defendant works directly for M&I as its Director of Product Development.

96.     In this type of position, Cargill believes that Defendant will be responsible for developing new customers and markets for M&I.

97.     In this role especially, Defendant – armed with the information he stole from Cargill – can cause substantial damage to Cargill's dielectric fluid business.

**The Information Stolen by Defendant Constitutes Cargill's Trade Secrets and Highly Confidential and Proprietary Information a Competitor Such As M&I Could Use to Improperly and Illegally Compete Against Cargill.**

98.     For all customers improperly contacted or solicited by Defendant and/or M&I, should Cargill lose the business in dielectric fluids, Cargill would sustain a significant loss in annual revenues or be forced to lower Cargill's prices.

16

99.     Defendant's unlawful actions, could result in permanent injury to Cargill's long-standing customer relationships.

100.    As a Cargill employee, Defendant had access to substantial information relating to Cargill's dielectric fluid business including highly confidential information about its customers, products, margins, revenues, sales strategies, training techniques and philosophy, profit percentages and markets, and the products those customers purchased.

101.    Cargill, as part of doing business, generates, develops, compiles and analyzes, substantial information concerning each customer, including their product preferences, buying patterns, customer pricing, customer practices, margins and profit variances, and the exact amount and type of business transactions with each customer.

102.    Cargill spends substantial amounts of money in obtaining, compiling, developing and analyzing this data and information, and then in making it available, together with extensive analysis, for use by its employment workforce.

103.    The data generated, compiled, analyzed and maintained by Cargill give employees like Defendant an extensive, confidential Company data and analysis on each customer and product they deal with.  This includes the Company's confidential data and analysis on gross profit by product and by customer, gross profit percentages, gross profit variance, historical invoices, product and payment data, customer purchasing trends, specific product preferences, needs and pricing of individual customers, as well as of the customer base, potential  discounted pricing and sales plans, current, historical, and projected volumes, costs, technical criteria, and other related data, as well as analysis of purchasing by product, market segment, and others.  The data and the proprietary analytical tools provide curated insights on how Cargill trains its employees and does business, and provide data analytics of sales to every customer and of every product sold.

104. This extensive data and analysis, to which Defendant had full access, is confidential Cargill data and information, not available to competitors and others, and constitutes Cargill's trade secrets. This information is available to the Cargill employees only by virtue of their position and employment with the Company. Using this Cargill data, employees like Defendant can isolate markets, customers, specialties, prices, margins, gross profit percentages, product sales, and other confidential data and analysis, to gain a competitive advantage related to individual customers, product categories, pricing and products. This data and information, which is developed and analyzed by Cargill at substantial cost, has significant economic value to Cargill because it is not available to competitors and others.

105. Defendant in the foregoing conduct, while still employed by Cargill, and in violation of his duties of utmost good faith and loyalty has contractual obligations to Cargill, as well as statutory obligations under state and federal law.

106. Upon information and belief, Defendant has misappropriated additional confidential information and trade secrets which have not yet been discovered.

107. As a direct result of Defendant's conduct as aforesaid, Cargill faces further future losses of customers and good will and potential erosion of profit margins as a result of Defendant's improper and unlawful conduct.

108. Further, Cargill incurred costs and retained counsel to investigate and remedy Defendant's conduct.

109. Defendant's breaches and violations of contract, law and duty as alleged herein, have damaged and will damage Cargill, in that they harm and tend to harm Cargill by damaging its business good will, significantly eroding its profit margins and interfering with its customer relationships, resulting in diversion and loss of sales and customers. Plaintiff has suffered and will continue to suffer lost sales, loss in the value of its relationships, and will be forced to incur

18

attorneys' fees and other costs to protect its interests. Cargill's good will with customers has been damaged and interfered with, and its reputation harmed.

110.    Defendant's actions reflect his blatant disregard for legal, common law, and statutory obligations and evinces intent to continue with these violations.

111.    Cargill will suffer immediate and irreparable harm if Defendant's actions are not temporarily, preliminarily, and/or permanently enjoined.

**COUNT I**
**Misappropriation of Trade Secrets Under the Defend Trade Secrets Act**
**(18 U.S.C § 1836, *et seq.*)**

112.    Plaintiff repeats, realleges, and incorporates by reference the prior allegations of this Complaint, as if fully set forth herein.

113.    Cargill owned and possessed certain confidential, proprietary and trade secret information, as alleged above.

114.    This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in interstate or foreign commerce.

115.    Cargill has taken reasonable measures to keep such information secret and confidential.

116.    This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

117.    In violation of Cargill's rights, Defendant misappropriated the confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein.

19

118.    Defendant's misappropriation of the confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

119.    Defendant has failed to return Plaintiff's confidential and trade secret information, and attempted to conceal his theft of this information.  On information and belief, if Defendant's conduct is not remedied, and if Defendant is not enjoined, Defendant will continue to misappropriate, disclose, and use for his own benefit and to Cargill's detriment, Cargill's trade secret information.

120.    Further, upon information and belief, Cargill believes that Defendant has already and is poised to share Cargill's trade secret information with one if its primary competitors, M&I.

121.    As the direct and proximate result of Defendant's conduct as aforesaid, Cargill has suffered and, if Defendant's conduct is not stopped, will continue to suffer, immediate and irreparable injury and significant damages in an amount to be proven at trial.

122.    Because Cargill's remedy at law is inadequate, Cargill seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and other legitimate business interests.

123.    Cargill is further entitled to injunctive relief against Defendant and all those acting in concert or participation with him, remedying their past improper conduct, and preventing such conduct in the future.

124.    Cargill will suffer immediate and irreparable harm, if the requested injunctive relief is not granted.

125.    Cargill's business is reliant on its business reputation and its ability to maintain and grow its client base in a competitive market and will continue to suffer irreparable harm absent injunctive relief.

126.     Cargill has a substantial likelihood of success on the merits because of Defendant's blatant, willful, and malicious misappropriation of trade secrets through the improper and unlawful methods, as alleged herein.

127.     Plaintiff has been damaged by all of the foregoing, and is entitled to its damages, in an amount to be determined at trial, as well as an award of exemplary damages and attorney's fees.

## COUNT II
### Misappropriation of Secrets Under the Wisconsin Uniform Trade Act
### (Wis. Stat. § 134.90, *et seq.*)

128.     Plaintiff repeats, realleges, and incorporates by reference the prior allegations of this Complaint, as if fully set forth herein.

129.     Plaintiff owned and possessed confidential and proprietary documents and data containing trade secrets, including, but not limited to, customer lists, analyses and information, all as alleged herein.

130.     Cargill made reasonable efforts to keep secret the information contained in these confidential and proprietary documents, by, among others, limiting access to confidential information, requiring employees, including Defendant, to sign confidentiality agreements, implementing employment policies that required confidentiality, and limiting computerized access.

131.     Cargill's trade secrets contained in the documents and data alleged herein, derive independent economic value, both actual and potential, from not being generally known to other persons, businesses, or the public, who could obtain economic value from their disclosure or use.

132.     In violation of Cargill's rights at law and under contracts, Defendant misappropriated the trade secret data, documents and information described herein, by secretly downloading highly sensitive and confidential documents to USB/flash drives that he never

21

returned to Cargill, concealed from Cargill, and, upon information and belief, still has in his possession, custody, or control.

133.    Further, upon information and belief, Cargill believes that Defendant has already and is poised to share and/or use Cargill's trade secret information with one of its primary competitors, M&I.

134.    As the direct and proximate result of Defendant's misappropriation as aforesaid, Cargill has suffered and, if Defendant's conduct is not enjoined, will continue to suffer immediate and irreparable injury, as well as damages in an amount to be determined at trial.

135.    Cargill will suffer immediate and irreparable harm, if the requested injunctive relief is not granted.

136.    Because Cargill's remedy at law is inadequate, Cargill seeks, in addition to its damages, temporary, preliminary and permanent injunctive relief to recover and protect its trade secrets and other legitimate business interests.

137.    Cargill is further entitled to injunctive relief against Defendant and all those acting in concert or participation with him, remedying their past improper conduct, and preventing such conduct in the future.

138.    Cargill has a substantial likelihood of success on the merits because of Defendant's blatant misappropriation of trade secrets, as set forth herein.

139.    Defendant's acts were malicious, fraudulent, and oppressive, and were done with conscious disregard of Cargill's rights, all within the meaning of the Wisconsin Uniform Trade Secrets Act, Wis Stat. § 134.90 *et seq*. in that Defendant misappropriated Cargill's trade secret information intentionally and knowingly and with a deliberate intent to benefit himself and injure Cargill's business. Cargill is entitled to its damages, in an amount to be determined at trial, as well as injunctive relief, and an award of punitive damages and attorney's fees.

22

## COUNT III
## Breach of Fiduciary Duty/Duty of Loyalty

140.     Plaintiff repeats, realleges and incorporates by reference the prior allegations of this Complaint, as if fully set forth herein.

141.     As an employee of Plaintiff, Defendant owed Cargill his undivided loyalty and was obligated to act with the utmost good faith, and in Cargill's best interests.

142.     Cargill was entitled to place its trust and confidence in Defendant and to expect Defendant to act with the utmost good faith toward it in carrying out Cargill's business.

143.     Cargill relied on Defendant's loyalty and integrity and his faithful performance of his duties and responsibilities.

144.     Defendant took advantage of Cargill's faith in him by not performing his duties to Cargill by, inter alia, covertly stealing Cargill's highly confidential information and trade secrets, by concealing that misconduct, and by accessing Cargill's salesforce.com account after his last day of active employment and without a legitimate purpose, and by, upon information and belief, feeding Cargill's highly confidential information and trade secrets to its competitor, M&I.

145.     Defendant knowingly and willingly breached his duty of loyalty to Cargill by the aforesaid misconduct.

146.     Defendant acted in a manner inconsistent with his agency and trust by engaging in the aforesaid misconduct.

147.     As a direct and proximate result of Defendant's disloyalty to Cargill and breach of his fiduciary duties, Cargill has been and is being harmed.

148.     Cargill is entitled to its damages, in an amount to be determined at trial, as well as disgorgement from Defendant, and the forfeiture and return of all monies and compensation paid to him during his period of disloyalty, the exact amount to be determined at trial.

23

149.     Cargill is further entitled to injunctive relief against Defendant and all those acting in concert or participation with him, remedying their past improper conduct, and preventing such conduct in the future.

150.     Defendant is, on information and belief, still in possession of Cargill's confidential and trade secret information, and, on information and belief, is able to access and use this information on behalf of Cargill's competitor, M&I.

151.     Further, on information and belief, Defendant shared this confidential information with others who may use, or are using the information to Cargill's detriment.

152.     As a direct and proximate result of Defendant's disloyalty, Cargill has been immediately and irreparably injured, and has suffered damages in an amount to be determined at trial.

153.     Cargill will suffer immediate and irreparable harm, if the requested injunctive relief is not granted.

154.     Because its remedy at law is inadequate, Cargill seeks, in addition to its damages, preliminary and permanent injunctive relief, enjoining Defendant, and all those acting in concert or participation with him, from further improper conduct, and further remedying their improper conduct as aforesaid.

## COUNT IV
## Tortious Interference

155.     Plaintiff repeats, realleges, and incorporates by reference the prior allegations of this Complaint, as if fully set forth herein.

156.     Cargill had a reasonable business expectancy and ongoing relationship with its customers.  Cargill had a reasonable expectation in engaging in business with, and in earning profits in connection with sales to, (a) its existing customers with whom Defendant dealt, (b) new customers with whom Defendant dealt while employed by Cargill, and (c) customers who

24

were involved in negotiations and discussions with Cargill and/or with Defendant, while he was employed by Cargill.

157. Defendant knew of Cargill's business relationship and business expectancy from the customers.

158. Defendant intentionally, and in violation of his duties, interfered with that expectancy by diverting existing and prospective accounts, and by other improper means. Defendant engaged in this diversion through fraudulent and deceitful conduct, such as that alleged herein, and other conduct that may be discovered.

159. Defendant's misconduct was intentional, outrageous, and deceitful, and committed in reckless disregard of his duties and Cargill's rights.

160. As a direct and proximate result of Defendant's improper conduct, Cargill has suffered damages, including lost profits, the exact amount to be determined at trial.

161. In addition, Defendant's wrongful acts were also willful, oppressive, malicious and/or fraudulent, thereby justifying an award of punitive damages.

## COUNT V
## Conversion

162. Plaintiff repeats, realleges, and incorporates by reference the prior allegations of this Complaint, as if fully set forth herein.

163. Cargill retained all rights, titles, and interest in the trade secrets and other information and property taken by Defendant.

164. By taking Cargill's documents and information, Defendant deprived Cargill of the full enjoyment and use of this information, without Cargill's consent, and without lawful justification.

165. As a direct and proximate result of Defendant's illegal conversion, Cargill has suffered substantial damages.

25

166.     As a direct and proximate result of Defendant's conversion, as aforesaid, Cargill has suffered and, if Defendant's conduct is not enjoined, will continue to suffer immediate and irreparable injury, as well as damages in an amount to be determined at trial.

167.     Cargill will suffer immediate and irreparable harm, if the requested injunctive relief is not granted.

168.     Because Cargill's remedy at law is inadequate, Cargill seeks, in addition to its damages, temporary, preliminary and permanent injunctive relief to recover and protect stolen information and other legitimate business interests.

169.     Cargill is further entitled to injunctive relief against Defendant and all those acting in concert or participation with him, remedying their past improper conduct, and preventing such conduct in the future.

170.     Cargill has a substantial likelihood of success on the merits because of Defendant's blatant misappropriation and conversion of Cargill's proprietary, confidential, and trade secret information, as set forth herein.

171.     Defendant's actions have been willful, malicious, outrageous, and undertaken with reckless indifference to Cargill's rights.

## REQUEST FOR RELIEF

WHEREFORE, having alleged this Complaint against Defendant, Plaintiff prays that the Court award the following relief:

(a)     Temporary, preliminary, and permanent orders requiring Defendant and all those persons and entities acting in concert and participation with him to return to Cargill all documents, data, and other Cargill property (including any and all information received by Cargill under license from third parties), including the USB/flash drives used to download and/or

copy information from Cargill's computers for copying and examination by Cargill's forensic experts;

(b)     Temporary, preliminary, and permanent relief ordering Defendant and all those persons and entities acting in concert and participation with him to turn over to Cargill all computers, electronic devices, cloud-based storage accounts, social media accounts, and other storage media that have been used at any time to store and/or access Cargill's information, data, and documents for copying and examination by Cargill's forensic experts;

(c)     Temporary, preliminary, and permanent relief ordering Defendant, under penalty of perjury, to identify in writing all individuals and/or entities with whom he has shared any of Cargill's information, data, or documents since November 21, 2016, including but not limited to any individuals employed by or affiliated with M&I;

(d)     Temporary, preliminary and permanent relief ordering Defendant to identify, under penalty of perjury, any and all Cargill information, data, and documents that he has deleted or permanently destroyed since November 21, 2016;

(e)     Temporary, preliminary and permanent relief restraining and enjoining Defendant and all those persons and entities acting in concert and participation with him from sharing, misappropriating, and using Cargill's information, data, or documents;

(f)     Temporary, preliminary, and permanent orders restraining and enjoining Defendant and all those persons and entities acting in concert and participation with him from otherwise possessing, using or disclosing Cargill's trade secrets and other confidential information;

(g)     Temporary and preliminary orders restraining and enjoining Defendant from working for, being affiliated with, and/or performing any services for any competitor of Cargill, including but not limited to M&I;

(h)     Judgment against Defendant for damages in an amount to be proven at trial;

(i)     Judgment against Defendant in the amount of their unjust enrichment as a result of their trespass of chattel, misappropriation, and use of Plaintiff's trade secrets and other proprietary information;

(j)     Judgment against Defendant for double damages for their willful and malicious misappropriation of Plaintiff's trade secrets pursuant to 18 U.S.C. § 1836;

(k)     Judgment against Defendant in the amount of Plaintiff's reasonable attorney's fees and costs, as authorized by 18 U.S.C. § 1836 *et seq.*, and Wis. Stat. § 134.90 *et seq.*; and

(l)     Such other and further relief as this Court deems just and equitable.

Respectfully submitted,

COZEN O'CONNOR

By:  __/s/ Gary Gassman_____
Gary L. Gassman, Esq.
David J. Walton, Esq. *admission pending*
Danielle Harris, Esq. *admission pending*
Cozen O'Connor
123 N. Wacker Drive, Suite 1800
Chicago, IL 60606
(312) 474-7900
ggassman@cozen.com
dwalton@cozen.com
danielleharris@cozen.com

*Attorneys for Plaintiff, Cargill, Incorporated*

DATED this 2nd day of March, 2017.