# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CARGILL INCORPORATED,**
    **Plaintiff/Counter-Defendant,**

    v.                                    Case No. 17-CV-300

**DAVID BINGENHEIMER,**
    **Defendant/Counter-Plaintiff.**

## ORDER

Both parties have filed motions for summary judgment. Bingenheimer has moved for summary judgment on Cargill's claims of misappropriation of trade secrets in violation of state and federal law, breach of various duties, tortious interference with prospective economic relations, and conversion, and his own counterclaims. ECF No. 46. Cargill has moved for summary judgment on Bingenheimer's counterclaims of tortious interference of a contract and defamation. ECF No. 54. For the reasons that follow, I **GRANT in part** and **DENY in part** Cargill's motion, and **DENY** Bingenheimer's motion.

## I. BACKGROUND

David Bingenheimer worked for Cargill as a Global Technology Manager, focusing on business development, technical expertise, and customer support for dielectric-fluids.[1] ECF No. 56, ¶ 1. For its dielectric-fluid business, Cargill invested significant resources into developing formulas, business plans, customer lists, vendor lists, pricing and sales data, financial information, operating procedures, trade secrets, and confidential information to give it a competitive advantage. *Id.* at ¶ 4. Before Cargill,

---

[1] Dielectric-fluids are used for equipment like electrical transformers, as well as insulators in high-voltage applications, such as transformers, capacitors, high-voltage cables, and switchgear. ECF No. 56, ¶ 2.

Bingenheimer worked for Cooper Power Systems ("CPS"), which is the company that originally developed the knowledge and trade secrets relating to dielectric-fluids, including the use of Envirotemp FR3™ ("FR3") in electrical transformers. *Id.* at ¶¶ 5-6. While at CPS, Bingenheimer worked as Global Product Line Manager for FR3 dielectric-fluids, which allowed him access to unique testing and product data.[2] *Id.* at ¶ 7.

## A. Bingenheimer at Cargill

In June 2012, Cargill bought Cooper's dielectric-fluid business. *Id.* at ¶ 10; ECF No. 65, ¶ 1. As part of this deal, Cargill licensed all of CPS's trade secrets and confidential proprietary information and product data relating to FR3. ECF No. 56, ¶ 10. On July 2, 2012, Bingenheimer started working at Cargill as a Product Manager, later being promoted to Global Technology Manager for the dielectric-fluid business. *Id.* at ¶ 11. Bingenheimer was responsible for managing personnel, resolving operational issues, and representing Cargill at industry events. *Id.* at ¶ 12. Bingenheimer was also involved in the technology, marketing, and sales of dielectric-fluids. *Id.* Bingenheimer was one of very few Cargill employees who had comprehensive knowledge about certain dielectric-fluids such as FR3 and the dielectric-fluids market and had access to Cargill's most sensitive and valuable business information, including product formulas, profit margins, and customer revenues. *Id.* at ¶ 13. Throughout his employment with Cargill, Bingenheimer had access to Cargill's most sensitive and confidential information about FR3, including all testing data and technology strategies, global commercial

---

[2] While Bingenheimer worked for CPS, Cargill and CPS had an agreement where Cargill manufactured FR3 for CPS, which CPS would then sell part of its transformer business. *Id.* at ¶ 8. CPS had a patent covering the use of dielectric-fluids in transformers in North America; the U.S. patent expired in late 2015 and the other North and South American patents expired at various times soon after. *Id.* at ¶ 9; ECF No. 65, ¶ 3.

strategies, competitive information and strategies, customer tactics, sales pricing, and volumes.[3] *Id.* at ¶ 14.

**B. Bingenheimer is laid off by Cargill**

On November 21, 2016, as part of a restructuring, Bingenheimer was laid-off.[4] *Id.* at ¶ 21. After his separation meeting on November 22, Cargill gave Bingenheimer several days to remove personal items from his company computer. *Id.* at ¶ 25.

Cargill alleges that this is when Bingenheimer "stole" its confidential information and trade secrets, downloading this information from his Cargill computer onto a USB flash drive. *Id.* at ¶¶ 26-27. According to Cargill, Bingenheimer downloaded sensitive and confidential documents relating to budgeting, formulas, technology and business strategies, financial information, sales and growth plans, and information on Cargill's customers, in a "carefully orchestrated" effort. *Id.* at ¶¶ 29-30. Bingenheimer also kept such documents on a flash drive, which had copies of business plans and strategies prepared by Bingenheimer and his Cargill co-workers for how Cargill would pursue business in every region where Cargill sold dielectric-fluids. *Id.* at ¶¶ 31-33. When Bingenheimer returned his company computer on November 29, he did not return either the downloaded documents or the flash drive. *Id.* at ¶ 36. Bingenheimer disputes this "carefully orchestrated" characterization, stressing that much of this information was simply not confidential; regardless, Bingenheimer never communicated this information

---

[3] To protect its trade secrets and confidential information from unauthorized disclosure, Cargill restricts access to such information to employees who have a legitimate need for the information. *Id.* at ¶ 15.
[4] On November 29, Bingenheimer signed and returned a separation agreement that required the return of "all files, memoranda, documents, records, copies of the following, credit cards, keys and any other property of Employer in Employee's possession" and that "[a]ny proprietary and confidential information and trade secrets that Employee received during Employee's employment that is not in the public domain shall be kept completely confidential and will not be shared by Employee with anyone." *Id.* at ¶¶ 23-24. *See also* ECF No. 56-8, § 7 (Separation Agreement, "COMPANY PROPERTY"); ECF No. 12, ¶ 56.

to anyone, and Cargill was never deprived of this information or its use. ECF No. 61, ¶¶ 28-33. Rather, Bingenheimer did not turn in the flash drive because he was referencing work-related information while job-searching, something he did not think was abnormal nor intended to be duplicitous. *Id.* at ¶¶ 34-35.

**C. Bingenheimer begins working for M&I**

On November 28, 2016, Bingenheimer was contacted by a corporate recruiter who notified Bingenheimer that there was a job opportunity with M&I Materials ("M&I"), a significant competitor to Cargill. ECF No. 56, ¶ 39. On December 2, Bingenheimer discussed potential employment with Alonso Castillo, an M&I executive, and met with Castillo for an in-person interview on December 13. *Id.* at ¶¶ 41, 43; ECF No. 65, ¶ 19. Between the initial call and the in-person meeting, Bingenheimer accessed his Cargill salesforce.com account and downloaded several documents, including a business plan for Europe, carbon footprint and dielectric-fluid product flow charts, a formula, and a sales presentation for FR3, to a flash drive. ECF No. 61, ¶¶ 40, 42, 44-45. Bingenheimer denies communicating any confidential information and that other documents that Cargill points to were not confidential. *Id.*

On January 30, 2017, Bingenheimer accepted an offer to join M&I as VP of Business Development and develop a new division to generate business in North America to compete directly against Cargill for the sale of dielectric-fluids in transformers. ECF No. 56, ¶¶ 54-55. Starting February 1, Bingenheimer again accessed information from his time at Cargill, including documents identifying Cargill's top customers, product-design documents and FR3-specfic documents, information that he denies sharing. *Id.* at ¶¶ 56-57. Bingenheimer visited M&I's offices in Georgia on

4

February 6, and M&I's headquarters in Manchester, England on February 15. *Id.* at ¶¶ 58-59. Bingenheimer brought flash drives with Cargill information to Manchester and accessed documents while there, however Bingenheimer stresses that he did so only to review terminology and did not share any of Cargill's documents with M&I nor did he believe that they were confidential because most of them were publicly available. ECF No. 61, ¶ 61. Furthermore, Bingenheimer emphasizes that opening most of these documents was accidental, an assertion that Cargill attacks as not credible. *Id.* at ¶ 64. In all, Bingenheimer accessed at least seventy-one Cargill documents after his employment with Cargill ended, accessing sixty-eight of these documents while working for M&I. *Id.* at ¶ 67. Bingenheimer blanketly denies disclosing any of Cargill's confidential information to M&I or anyone else. *Id.* at ¶¶ 68-69.

D. **Howard Industries bid**

Howard Industries ("Howard") is a Cargill customer. ECF No. 66, ¶ 38. In late 2016, as Bingenheimer was being let go and discussing employment opportunities with M&I, Cargill was negotiating an amendment to its 2015 Supply Agreement with Howard and determining pricing for its dielectric fluid and submitted an initial bid on December 19, which resulted in a new 2017 contract. *Id.* at ¶¶ 40-41; ECF No. 65, ¶ 108. In January 2017, M&I approached Howard, offering a competitive bid that undercut Cargill and forced Cargill to cut its price;[5] Cargill believes that this could only be done with information provided to M&I by Bingenheimer, thus proving that he disclosed Cargill's proprietary information to M&I, while Bingenheimer argues that M&I's new bid was the result of long-term work done to pursue Howard dating back to mid-2016 (before he

---
[5] Cargill alleges it suffered a "seven-figure loss." ECF No. 66, ¶ 45.

started with M&I) and reiterates that he never provided Cargill's information to M&I or anyone else. *See* ECF No. 69, ¶¶ 43-45; ECF No. 65, ¶ 123.

**E. Complaint filed, Bingenheimer fired from M&I**

On February 23, 2017, Bingenheimer received notice from Cargill of their allegations surrounding his possession of Cargill's sensitive information and his subsequent contact with M&I.[6] ECF No. 65, ¶ 55. Cargill subsequently filed this action on March 2. ECF No. 1. On March 3, BizTimes Media – Milwaukee published an article about this case, the author's only source being the complaint, which he found on PACER. ECF No. 56, ¶¶ 87-92. *See also* ECF No. 56-18 (article). On March 4, a Cargill employee sent an email with a link to the BizTimes story to two Cargill customers, accompanied by the following message:

> Cargill is a very ethical company and we hope that our customers will stay away from (rather than reward with business) the individuals who act in this way and the companies that employ such individuals. Competition is one thing. These actions are a totally different thing.

ECF No. 65, ¶¶ 92, 94. A variant of this message was sent to two other Cargill customers by the same employee. *See id.* at ¶¶ 95, 97.[7] On March 13, M&I fired

---

[6] On February 22, Cargill placed M&I on notice that it knew that M&I employed Bingenheimer (and that Bingenheimer had information belonging to Cargill) and demanded that M&I take steps to prevent the use of Cargill information. ECF No. 65, ¶ 57; ECF No. 56-16 (demand letter). M&I executives denied having any knowledge of Bingenheimer's possession of Cargill information, which Cargill refuses to accept. ECF No. 65, ¶ 58-59, 61. *See also id.* at ¶¶ 62-82 (detailing March 1 conversation between Cargill and M&I executives regarding Bingenheimer).

[7] From an email dated March 5:

> We need a coordinated plan (and proactive communication/outreach to customers) to neutralize the impact of Bingenheimer's shenanigans and any negating leverage that Midel may have gained through information Bingenheimer may have conveyed explicitly or implicitly. I hope that our customers will see through all of this and not give Midel an unfair advantages - after all, ethics matters and utilities are large companies serving the public good; they are not crooks, so they should not benefit from unethical business practices.

ECF No. 65, ¶ 95. And from another email, also dated March 5:

Bingenheimer. ECF No. 56, ¶ 93. Bingenheimer subsequently filed counterclaims for tortious interference with a contract and defamation. *See* ECF Nos. 12 & 23.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). Evaluations of witness credibility are inappropriate at the summary judgment stage. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citing *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007)). However, when challenges to witness credibility are all that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper. *Id*. (citing *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998)). Self-serving statements based on personal knowledge are admissible at summary judgment. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 (7th Cir. 2004).

---

> There's another matter to which I would like to draw your attention before you find out through the grapevine; stories have already started appearing in the press (see https:///www.biztimes.com/2017/industries/law/cargill-sues-formermillwaukee-area-emplovee/). Robert Wilson will probably say "I never liked this guy" and he may very well have been right. Cargill is a very ethical company and we hope that our customers will stay away from the individuals who act in this way and from the companies that employ such individuals. Competition is one thing. These acts are a totally different thing and should not be rewarded. Please let me know if there is any additional information I can provide.

ECF No. 65, ¶ 97. *See also* ECF No. 50-2.

## III. DISCUSSION[8]

Bingenheimer moves for summary judgment on both Cargill's claims and his counterclaims. ECF No. 46. Cargill moves for summary judgment solely on Bingenheimer's counterclaims. ECF No. 54. I will address the parties' cross motions as to Bingenheimer's counterclaims first.

### A. Bingenheimer's counterclaims

Bingenheimer's amended counterclaim raises tortious interference with Bingenheimer's employment contract with M&I and defamation. ECF No. 23, ¶¶ 22-35.

#### 1. Tortious interference of a contract

Under Wisconsin law, a claim for tortious interference with a contract requires proof of five elements: "(1) the plaintiff had a contract or a prospective contractual relationship with a third party,[9] (2) the defendant interfered with that relationship, (3) the interference by the defendant was intentional, (4) there was a causal connection between the interference and damages, and (5) the defendant was not justified or privileged[10] to interfere." *Wesbrook v. Ulrich*, 840 F.3d 388, 395 (7th Cir. 2016) (quoting *Briesemeister v. Lehner*, 295 Wis.2d 429, 720 N.W.2d 531, 542 (Wis. App. 2006)). Interference is defined as "any conduct or words conveying to [a third party] the defendant's desire to influence [the third party] to refrain from dealing with the plaintiff." *River Valley Bank v. Becker Properties of Wausau LLC*, 2017 WL 5449797, at ¶ 23 (Wis. App. 2017) (quoting WIS JI—CIVIL 2780).

---

[8] Neither party has raised jurisdiction, however I note that the court has jurisdiction of this matter under 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy requirement is satisfied. Likewise, jurisdiction is justified under § 1331 and § 1367, as the federal and state claims here form part of the same case or controversy.
[9] Cargill concedes this element. ECF No. 64 at 17.
[10] Defendants possess the burden of proving justification. *Thiesing v. Dentsply Int'l, Inc.*, 748 F.Supp.2d 932, 953 (E.D. Wis. 2010).

Further, interference alone, does not establish the tort; the interference must be improper. *Mackenzie v. Miller Brewing Co.*, 2000 WI App 48, ¶ 63 (2000) (citing *Liebe v. City Fin. Co.*, 98 Wis.2d 10, 15, 295 N.W.2d 16 (Wis. App. 1980)). "One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." *Briesemeister*, 295 Wis.2d at 454-455 (quoting Restatement (Second) of Torts § 773 (1979)). A party has a right to protect what he believes to be his legal interest; even if the party's position is ultimately incorrect, liability should nevertheless not be imposed on that lone factor. *Cudd v. Crownhart*, 122 Wis.2d 656, 662 (Wis. App. 1985) (citing Restatement (Second) of Torts § 773 (1979)).

Bingenheimer argues that the interactions between executives from M&I and Cargill (referenced in footnote 6) led to Bingenheimer's firing and thus constitutes tortious interference by Cargill. ECF No. 23, ¶¶ 24-27. Without the contact(s) from Cargill executives to M&I asserting that Bingenheimer's continued employment would be harmful to its reputation and would result in legal action, Bingenheimer would have remained employed by M&I. *Id.* at ¶ 26. Cargill, in response, argues that there was simply no interference and, even if there was, such interference was justified because M&I is a competitor; there was a clear urgency in protecting Cargill's sensitive information, which included its customer lists, pricing details, and formulas. Reviewing the record, I find that there are too many outstanding issues of fact to support a finding

9

for either party on this claim at summary judgment, particularly given the contested nature of the contact made between Cargill and M&I, which appears open to differing interpretations and may hinge on judgments as to witness credibility. Furthermore, even though Cargill's actions may well have been justified, to the extent that there was any interference, the question of justification or privilege for interfering with another's employment is ordinarily one decided by a jury. *See Thiesing*, 748 F.Supp.2d at 953–54 ("The issue of justification is usually an issue of fact, with the test being what is reasonable conduct under the circumstances."). *See also Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 44, 294 Wis.2d 274, 717 N.W.2d 781 (2006) ("All of these elements require full factual development."); 26 A.L.R.2d 1227, § 31 ("[T]he question of justification for procuring a breach of contract or interference with another's employment is ordinarily for the jury."). Accordingly, both parties' motions as to this claim are denied.

### 2. Defamation

The elements of a common law action for defamation are: (1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the one defamed; and (3) the communication is unprivileged and tends to harm one's reputation, lowering him or her in the estimation of the community or deterring third persons from associating or dealing with him or her. *Ladd v. Uecker*, 2010 WI App 28, ¶ 8, 323 Wis.2d 798, 780 N.W.2d 216 (citing *Torgerson v. Journal/Sentinel, Inc.,* 210 Wis.2d 524, 534, 563 N.W.2d 472 (1997)). Bingenheimer argues that the complaint itself and the emails from a Cargill employee (referenced above) linking to and commenting on the BizTimes article are defamatory, as was Cargill's representation to M&I that

Bingenheimer had a binding non-compete agreement. ECF No. 23, ¶ 32. Cargill's complaint is subject to absolute privilege that precludes liability, so Cargill is entitled to summary judgment on that front. *See Bergman v. Hupy*, 64 Wis.2d 747, 750, 221 N.W.2d 898 (1974) ("[P]arties and counsel are immune from liability for 'relevant statements in pleadings and otherwise in the course of judicial proceedings.'") (quoting *Bromund v. Holt*, 24 Wis. 2d 336, 342, 129 N.W.2d 149 (1964)). *See also Schlafer v. Quality Concrete Prod.*, 1992 WL 274740, at *2 (Wis. App. 1992). I will also award summary judgment to Cargill to the extent that Bingenheimer is pursuing a defamation claim on publication of the BizTimes article, as Cargill was not in any way involved with the writing or publishing of said article. *See generally* ECF No. 56-19 (deposition of BizTimes story writer).

I will allow Bingenheimer to proceed on his defamation claim with respect to the dissemination of the BizTimes article by Cargill accompanied by commentary relating to Bingenheimer's character and credibility, *see* ECF No. 23, ¶¶ 31, 33, as outstanding questions of fact remain to as to the truth/falsity of specific statements made in the emails referenced above, specifically whether Bingenheimer transmitted Cargill data and proprietary information to M&I. I will also allow Bingenheimer's claim to proceed with respect to a Cargill executive's incorrect representation to M&I that Bingenheimer had a binding non-compete with Cargill, ECF No. 23, ¶ 32, as it may have played a role in his firing from M&I and fact issues exist as to nature and extent of the M&I-Cargill contacts. *See* ECF No. 50-9 (deposition of another M&I executive), 114:17-21 (explaining Bingenheimer's termination). Further factual development is also required to determine the extent (if any) to which above-referenced statements are privileged.

Thus, with respect to the defamation claim, Bingenheimer's motion is denied and Cargill's is granted in part and denied in part.

**B. Cargill's claims**

Cargill's complaint raises claims of (1) misappropriation of trade secrets under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*; (2) misappropriation of secrets under the Wisconsin Uniform Trade Act, Wis. Stat. § 134.90; (3) breach of fiduciary duty/duty of loyalty; (4) tortious interference with Cargill's contractual relationships with its customers; and (5) conversion. ECF No. 1, ¶¶ 112-171. Bingenheimer's principal argument in support of his summary judgment motion is that he did not share any of Cargill's proprietary information and Cargill has no evidence that he did; therefore, no reasonable jury could find that he misappropriated trade secrets.[11] However, this lack of *direct* evidence is not fatal to Cargill at summary judgment because trade secret cases often rely exclusively on circumstantial evidence. *See*, *e.g.*, *Metso Minerals Indus., Inc. v. FLSmidth-Excel LLC*, 733 F.Supp.2d 965, 968 (E.D. Wis. 2010) ("[I]t is not unusual for a plaintiff alleging use of trade secrets to lack direct evidence thereof… Thus, claims brought under variants of the Uniform Trade Secret Act may be proven through circumstantial evidence.") (citations omitted); *Tempco Elec. Heater Corp. v. Temperature Eng'g Co.*, 2004 WL 1254134, at *9 (N.D. Ill. June 3,

---

[11] Bingenheimer also argues that because he returned all of Cargill's information, Cargill has no additional remedy under the relevant trade secret statutes. This is incorrect; Cargill could still be granted further injunctive relief and damages. *See* 18 U.S.C. § 1836(b)(3) (remedies); Wis Stat. § 134.90(3)(b)-(c) (prospective injunctive relief); Wis Stat. § 134.90(4) (damages). Bingenheimer also makes reference to an arbitration agreement that supposedly deprives the court of jurisdiction to consider a number of Cargill's claims. However, enforcement of a forum selection clause, including an arbitration clause, is not jurisdictional; rather, it is a waivable defense. *Auto. Mechanics Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 743 (7th Cir. 2007). *See also Johnson v. Orkin, LLC*, 556 F.App'x 543, 544 (7th Cir. 2014) ("An arbitration clause is simply a type of forum-selection clause[.]"). Thus, Bingenheimer's jurisdictional arguments in this context are unavailing, regardless of the separation agreement's applicability to the claims at issue.

2004) ("[I]n considering the sufficiency of [plaintiff's] circumstantial evidence, [plaintiff] does not have to meet a burden of being 'likely to prevail,' but need only show that a reasonable jury could possibly allow them to prevail."); *Peerless Indus., Inc. v. Crimson AV LLC*, 2015 WL 1275908, at *13 (N.D. Ill. Mar. 17, 2015) (denying summary judgment because there was evidence that the defendant gained business advantages it did not have until it gained access to the plaintiff's confidential information, because plaintiffs in trade secret cases must oftentimes "construct a web of perhaps ambiguous circumstantial evidence" to convince a jury).

In *Metso Materials*, for example, a lack of *direct* evidence was not fatal to a plaintiff's claims in the trade secret context and did not warrant granting defendants summary judgment. 733 F.Supp.2d at 968. Here, the fact that Cargill does not have direct, "smoking-gun" evidence that definitively shows that Bingenheimer disclosed Cargill's proprietary information to M&I is not dispositive. Bingenheimer possessing Cargill's information, accessing it dozens of times after his termination from Cargill, during his job search, and after his subsequent hiring at M&I, combined with the submission of M&I's undercutting bid to Howard, is enough for a reasonable jury to find for Cargill and thus makes summary judgment inappropriate on these claims. For the same reasons, I will deny Bingenheimer's motion for summary judgment with respect to Cargill's claims for breach of duty of loyalty, tortious interference with its customer, and conversion. Thus, Bingenheimer's motion is denied with respect to Cargill's claims.

## C. Motions to Restrict

Finally, I note that the parties have filed a bevy of motions to restrict access to filings. ECF Nos. 45, 49, 62, 63, 67, & 70. The parties filed a stipulated protective order

shortly after this litigation commenced, which I signed. ECF No. 19. I also issued a separate order, instructing the parties to make careful note of the local rules, to follow those rules when filing confidential materials with the court, and to be sure that the appropriate party demonstrates good cause for removing the material from the public record. ECF No. 18 at 2-3. A party does not show good cause simply by noting that the material was designated confidential pursuant to a protective order; rather, to show good cause, the party must show that the material reveals a trade secret or other information that may be withheld from the public record. *Id*. at 3.

    The motions to restrict the filings are unopposed, but because I have an obligation to the public to ensure that court filings remain open to public review unless good cause for restricting them is shown, I must still decide whether the materials may be restricted. *Henley v. C.R. Bard, Inc.*, 2019 WL 6529433, at *5 (E.D. Wis. Dec. 4, 2019). The Seventh Circuit has instructed that documents that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality. *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002). *See also City of Greenville, Ill. v. Syngenta Crop Protection, LLC*, 764 F.3d 695, 698 (7th Cir. 2014) (the public has no right to access documents that "cannot conceivably aid the understanding of judicial decisionmaking"). Further, subject to certain limited exceptions, the court will consider all filed materials public unless they are accompanied by a separate motion to seal. Gen. L. R. 79(d)(1), (d)(5). The separate motion must be publicly filed and must describe the general nature of the information withheld from the public record. Rule 79(d)(2). "To the extent possible, the movant should include with the public filing a

version of the document or material that redacts only those portions of the document that are subject to the sealing request." *Id.*

I reiterate these points because the parties' requests to restrict public access here are grossly overbroad; many of the documents to which restricted access is sought are innocuous or are already publicly available as published articles or docketed filings. More importantly, the documents filed as "restricted" simply do not appear to contain information sensitive enough to qualify for bona fide long-term confidentiality. *See Baxter*, 297 F.3d at 547 ("[M]any litigants would like to keep confidential the salary they make, the injuries they suffered, or the price they agreed to pay under a contract, but when these things are vital to claims made in litigation they must be revealed."). Nor have the parties, in any of their six motions, demonstrated the good cause necessary to restrict access. *See* ECF No. 18 at 2-3. Accordingly, I will deny these motions, however I will deny without prejudice and will not instruct the Clerk of Court to remove the "restricted" designation that limits access to case participants and attorneys of record from any of these documents for 30 days. In this time period, the parties are encouraged to review the documents and exhibits that are currently filed under seal and to file a fresh motion to restrict filings where they believe good cause exists to restrict public access, attaching redacted versions of the materials in which only the trade secrets (or otherwise privileged information) are redacted. If such a motion is not filed, I will assume that the parties agree that all the materials may be unsealed and will file an order instructing the Clerk to unseal.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that Bingenheimer's motion for summary judgment (ECF No. 46) is **DENIED** and Cargill's motion for summary judgment (ECF No. 54) is **GRANTED in part** and **DENIED in part**. Bingenheimer may proceed on his interference claim and his defamation claim in its reduced scope. Cargill may proceed on all its claims.

**IT IS FURTHER ORDERED** that the parties' unopposed motions to restrict (ECF Nos. 45, 49, 62, 63, 67, & 70) are **DENIED without prejudice**. **However, the Clerk of Court shall NOT immediately remove the restrictions from the associated documents.** Instead, the parties shall have 30 days from the date of this order to show good cause for restricting particular documents. If either party contends that any document contains confidential information, they must attach to their motion a redacted copy of the document in which only the confidential information is removed.

Dated at Milwaukee, Wisconsin, this 19th day of March, 2020.

s/Lynn Adelman
LYNN ADELMAN
District Judge
